UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SHANITA WHITE, MOTHER                                                        Petitioner

v.                                                          Civil Action No. 3:25-cv-530-RGJ

JERRY WHITE, FATHER                                                          Respondent

* * * * *

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Petition of Shanita White ("Petitioner"), who resides in Germany, for return of her minor child, E.W., from the Commonwealth of Kentucky pursuant to the Hague Convention on the Civil Aspects of International Child Abduction. [DE 1]. Jerry White ("Respondent"), father of the minor child, filed an answer and affidavit of E.W. [DE 23, 23-2]. The Court held an evidentiary hearing, with testimony from Petitioner, Respondent, and the minor child (*in camera*), and engaged a guardian *ad litem*. [DE 27, 34, 38, 39].[1] The parties filed proposed findings of fact and conclusions of law and responses to the report of the guardian *ad litem*. [DE 36, 37, 41, 43]. This matter is ripe.  For the reasons below, the Petition is **DENIED**.

---

[1] The Court appointed a guardian *ad litem* pursuant to Federal Rule of Civil Procedure 17(c)(2) to assist the Court in making a fully formed decision and to render a recommendation as to whether there is (1) grave risk of physical or psychological harm to the child, and (2) whether the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to consider the child's wishes, as well as the extent to which the child's preference is the product of a parent's undue influence. [DE 38].

1

## I. FINDINGS OF FACT[2]

### a.    The Parties

Petitioner is an American citizen residing in Stuttgart, Germany and is a civilian employee assigned to work as the Branch Chief of the information technology department at the United States Africa Command in Stuttgart, Germany. [DE 1 at 1]. Respondent is an American citizen residing in the Commonwealth of Kentucky, Hardin County, is retired as of 2024 from the United States Army, and is now working as a contractor and private investigator. [DE 1 at 3]. The Petitioner and Respondent married in 2008 but have been living separately since 2019. [DE 1 at 4]. They have a 14-year-old biological son, E.W., who is the subject of this case. [DE 1 at 4, DE 23 at 211]. This past school year, E.W. attended John Hardin High School in Elizabethtown, Kentucky as a freshman. [DE 27 at 385]. Petitioner and Respondent also have an eighteen-year-old daughter, who attended the University of Louisville this past school year as a freshman. [DE 27 at 410].

### b.    E.W.'s Early Life

E.W. is a "military child" who was born in Fort Hood, Texas and moved to Columbus, Georgia as a baby. [DE 23 at 211, DE 39 at 489]. E.W. resided in Belgium and attended school there from pre-kindergarten to second grade. [DE 27 at 352]. The family then moved from Belgium to Fort Bragg, North Carolina. [DE 23 at 211, DE 27 at 322]. E.W. resided in the United States at Fort Bragg, North Carolina and attended third, fourth, and part of fifth grade there. [DE 23 at 211, DE 27 at 322].  E.W. reported to the guardian *ad litem* that, while in Fort Bragg, Petitioner would

---

[2] The Court notes some facts testified to and presented by the parties go more to the issue of custody of E.W., than the issues related to the Court's jurisdiction in this case although they can relate to the grave risk exception discussed below. The Court has considered those facts to the limited extent they are relevant to whether Petitioner has presented a prima facie claim under the Hague Convention or Respondent has proven a defense.  The Court does not wade into the question of custody of E.W.

work the night shift, and that Respondent was with E.W. at night unless Respondent was deployed. [DE 39 at 486]. He further reported that when Respondent was deployed, Petitioner worked the day shift. [*Id*.] Although never explicitly stated by the parties, it would appear that during these earlier years, Respondent was active in the military and the family moved in accordance with Respondent's military orders. [DE 27 at 322, Petitioner: "his [Respondent's] primary years were in Belgium and then we did a short PCS too – sorry, I want to be sure I'm accurate. From Belgium we went to North Carolina . . ."; Petitioner: "I have always been the primary parent. He was active duty military."].

### c.    Move to Germany and the Parties' Separation

In January 2021, Petitioner and the two children moved to Stuttgart, Germany, pursuant to her civilian military assignment and began working for the United States's Africa Command, known as AFRICOM. [DE 27 at 320]. Respondent was still active-duty military at this time and was stationed at Fort Knox, Kentucky, but would frequently travel to Europe for short assignments. [DE 27 at 338, 373-74]. Respondent ultimately believed he would later retire and join the family in Germany. [DE 27 at 389]. As a result, Respondent signed command sponsorship and passport documentation to facilitate the children's move to Germany, so that they could be "taken care of and settled," but not with any intent not to be a custodial parent or waive parental rights. [DE 27 at 376-77]. Petitioner testified this paperwork ensured the children had "Status of Forces protection" and other command-sponsored benefits. [DE 27 at 342].

Petitioner's assignment in Germany was generally subject to a five-year term. [DE 27 at 349]. However, Petitioner requested and has been granted an overseas extension through January 2027. [DE 27 at 349-50].  Petitioner's term may be further extended depending on Petitioner's wishes and the objectives of the mission. [DE 27 at 349-50, 356].

3

Respondent testified that he initially believed the family "would go to Europe, I would retire out of Fifth Corps and then move to Europe to be with the family. That changed, circumstances happened . . . we're seeking a divorce and everything like that, so that changed." [DE 27 at 375]. Respondent reported to the guardian *ad litem* that he and Petitioner "truly" separated in July 2022. [DE 39 at 480]. Despite the parties' separation, they have no written custody agreement or separation agreement, and they have not divorced. Instead, decisions regarding custody were made between the parties. [DE 27 at 409-10]. E.W. resided in Stuttgart, Germany from January 2021 through May 2025 with Petitioner and his older sister, completing fifth grades through eighth grade. [DE 27 at 322].

Beginning around October 2022, Respondent served approximately 9 months in Poland. [DE 27 at 374]. He lived in single solider military housing during that time, so the children were not able to stay with him. [DE 27 at 341]. During this time, the parties agreed their two children, both minors at the time, would continue to reside with Petitioner in Germany as Respondent was not in a position to provide custodial parenting to the children due to the constant travel required by his military duty assignment. [DE 1, at 4, DE 27 at 342, DE 27 at 374-75, DE 39 at 480, 482]. Petitioner testified that she was the primary parent for the children while Respondent was active-duty, living with them, taking the children to school, cooking for them, helping with homework, and day to day life. [DE 27 at 339-40]. Though Petitioner was the primary caregiver, Respondent had visits with the children during his active duty. While the children resided in Stuttgart, Respondent visited them in June 2022 for ten days, and in 2023, the children visited Respondent in the United States from June 27 to August 7, 2023, and spent the summer with him in the United States in 2024.

E.W. attended school in Stuttgart, Germany, on a military installation. [DE 27 at 352]. Petitioner testified that the parties had the option of sending E.W. to school on a military installation or an international school and they chose the school at the military installation. [DE 27 at 252].[3] E.W.'s grades fluctuated in middle school while in Germany, and Petitioner arranged twice-weekly tutoring and homework club for E.W. He also participated in sports, which provided him with balance that improved his performance in school. [DE 27 at 323]. He participated in German kickboxing, soccer, football, and basketball, and was active in Kappa League and Robotics. [DE 27 at 324]. E.W. was scheduled to be active with Yearbook in ninth grade. [DE 27 at 325]. E.W. has allergies, including peanuts, tree nuts, raw potatoes, pitted fruits, green beans, and lactose intolerance. [DE 27 at 335]. E.W. had established medical care in Germany, including a dentist, orthodontist, orthopedist, allergist, and a provider for shoe insoles. Braces were planned for his ninth-grade year. [DE 27 at 335].

---

[3] The terms "installation" and "base" have been used interchangeably by the parties in testimony and briefing. *See e.g.*, [DE 27 at 352, 354, 355, 385, 401]. A witness employed by the high school in Germany E.W. would have attended was interviewed by the guardian *ad litem* and explained that "there are four different military bases in the area that are somewhat spread out and collectively function like a small military community. There is on elementary school, one middle school, and one high school serving the community. Most residents are active-duty military members from various branches of the armed forces, through there are also civilian employees . . ." [DE 39 at 491-92]. It appears that a "military installation" is a broader term for property under United States jurisdiction and that a military base is a subtype of military installation. *See United States v. Apel*, 571 U.S. 359, 368 (2014) (generally describing the term "military installation" as used in federal law and citing 10 U.S.C. § 2687(g)(1) (defining "military installation" as a "base . . . or other activity under the jurisdiction of the Department of Defense"); § 2801(c)(4) (defining "military installation" as a "base . . . or other activity under the jurisdiction of the Secretary of a military department"); 32 CFR § 809a.0 ("This part prescribes the commanders' authority for enforcing order within or near Air Force installations under their jurisdiction and controlling entry to those installations"); *see also* 10 U.S.C.A. § 2801 (c)(4) ("[t]he term 'military installation' means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control."). Regardless, for purposes of this opinion, the Court attempts to use these terms in the way the parties have described them and use of "installation" or "base" conveys that the location is under the jurisdiction of United States Secretary of a military department of Secretary of Defense.

### d.    Respondent's Retirement from the Military and Return to Kentucky

In 2024, Respondent retired from active military service, returned to Kentucky, and moved into a three-bedroom apartment that has room for the children. [DE 27 at 341, DE 39 at 484-85]. In March 2024, the children attended Respondent's retirement in Kentucky and then the children spent the summer of 2024 with Respondent and summer of 2025 with Respondent.  During the summer of 2024, the parties' daughter expressed to both Petitioner and Respondent that she wanted to live with Respondent, and both children expressed that they wanted to live in the United States. [DE 27 at 349, 353]. E.W. expressed to Petitioner that he wanted to live with Respondent. [DE 27 at 384]. Respondent testified that at the end of the summer of 2024, the parties' daughter told him she was not getting back on the flight to Germany and that Respondent convinced her to go back because he thought that was what was best for his daughter "at the time to be in a more stable environment." [DE 27 at 376]. Ultimately, E.W.'s older sister moved back to the United States after graduating high school, staying with Respondent in Elizabethtown, Kentucky during the summer of 2025 and began college at the University of Louisville in Louisville, Kentucky, in the fall 2025. [DE 27 at 337].

### e.    Summer 2025 Visit to Kentucky

After E.W.'s older sister's high school graduation on June 3, 2025, E.W., his sister, and his father flew to Kentucky, where E.W. resided with Respondent for the summer. [DE 27 at 326-27]. Round trip airfare was purchased for E.W.'s trip to the United States with him arriving on or about June 8, 2025, and departing on August 17, 2025. [DE 27 at 326-30, 396, 413]. E.W.'s older sister also stayed with Respondent in Elizabethtown, Kentucky during the summer of 2025 and began attending college at the University of Louisville in Louisville, Kentucky in the fall.

6

During the summer of 2025, E.W. expressed to Petitioner that he objected to returning to Germany. [DE 27 at 386]. In June 2025, while E.W. was in Kentucky with Respondent, he texted Petitioner asking to live with Respondent. Petitioner disagreed and she told Respondent the decision would not be unilateral, and believed further discussion would occur. [DE 27 at 329, 399]. At the end of the summer of 2025, Respondent did not return E.W. to Germany and enrolled him in high school in Kentucky. Respondent testified that unlike the previous summer when his daughter requested to not return to Germany, he was in a position with a flexible job that allows him to care for E.W. [DE 327 at 386].

During the summer, Petitioner's brother died, and she traveled from Germany to Atlanta, Georgia to attend his funeral. [DE 27 at 327, 412]. Petitioner asked Respondent to modify E.W.'s return flight from Kentucky to Germany to align with her return to Germany from the funeral. [DE 27 at 327]. Respondent brought the children to the funeral on August 3, 2025. [DE 27 at 368]. At the funeral, Respondent did not inform Petitioner that E.W. would not be returning to Germany as he did not believe that would an appropriate time given the funeral. [DE 27 at 399]. Shortly after the funeral, Respondent texted Petitioner informing her that E.W. would not return to Germany, and that he had been enrolled in high school in Kentucky. [DE 27 at 411]. Also, after the funeral, Petitioner traveled to Kentucky to assist her daughter's move into college. [DE 27 at 412]. During that time, Petitioner was aware that E.W. would not be returning to Germany. [DE 27 at 412]. At the time, Petitioner had a brief interaction with E.W outside of Respondent's apartment while picking up items for the move-in, and the issue was not discussed. [DE 27 at 411].

E.W. was experiencing hip pain during this summer. [DE 27 at 337]. Respondent scheduled a doctor's appointment on August 4, 2025 for E.W. to address his hip pain. [DE 27 at 368]. At the funeral of Petitioner's brother, E.W. was using Respondent's crutch. [DE 27 at 363, 368]. After

7

the funeral, Respondent took E.W. to the doctor's appointment. [DE 27 at 368]. At that appointment, E.W.'s x-ray was unremarkable, and E.W. was placed on a steroid. [DE 27 at 368]. Respondent then requested an MRI because E.W. was still in pain. [DE 27 at 368]. Before Respondent received a response about an MRI, he took E.W. to the emergency room because E.W. was in significant pain. [*Id.*]. At the emergency room, an x-ray was taken, and Respondent was told to take E.W. to Norton's Children's Hospital in Louisville, Kentucky. [*Id.*] E.W. had surgery to repair a slipped growth plate at the top of his femur. [*Id.*] Respondent contacted Petitioner to inform her what was happening and Petitioner was able to talk to E.W.'s doctor post-surgery. [DE 27 at 338, 369]. E.W.'s emergency surgery for a femoral growth plate fracture occurred just after Petitioner returned to Germany. [DE 27 at 368, 413].

E.W.'s alleged wrongful retention began when Respondent did not return him from Kentucky to Germany on August 17, 2025.

### f.    E.W.'s Life in Kentucky

E.W. has resided in Kentucky with Respondent since summer 2025. He testified *in camera* that he loves living in the United States with Respondent, that he likes that his sister lives close by and visits on weekends and holidays, and that it is nice being able to see her. [DE 34 at 430, 436]. He also testified he has good friends here. [DE 34 at 430]. He testified that Germany is not a place he wants to be or be settled. [DE 34 at 431]. He testified that he had told Petitioner he does not want to live in Germany, but that she extended her assignment there. [DE 34 at 431]. E.W. testified that some of his friends in Germany have moved away, mainly because their parents' deployments have ended. [*Id.*] E.W. explained to the guardian *ad litem* that he does not want to return to Germany because he does not want to live in Germany, a country where he does not speak the language, does not like interacting with people off base, and generally only gets along with

children on base. [DE 39 at 488]. He reported to the guardian *ad litem* that he has friends in Germany but feels closer to his family, including his father and sister, in the United States. [DE 39 at 488]. He has both his mother's and father's extended family in the United States and feels uncomfortable in Germany. [DE 39 at 488]. Upon a second meeting with the guardian *ad litem*, E.W. again expressed that he does not like living in Germany, a place where he does not speak the language. [DE 39 at 491].

## II.  CONCLUSIONS OF LAW

The Hague Convention on the Civil Aspects of International Child Abduction was adopted by signatory nations to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague Convention, preamble).[4]  The "core premise" of the Convention is that "'the interest of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Convention, pmbl.). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id*. (citing Convention, art. 12). "Upon the child's return, the custody adjudication will proceed in that forum." *Id*.

In the United States, Congress has implemented the Hague Convention through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* (formerly 42 U.S.C. § 11601 *et seq*.). The ICARA provides federal district courts with jurisdiction to determine

---

[4] The Convention on the Civil Aspects of International Child Abduction is available on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Child Abduction Section." https://assets.hcch.net/docs/e86d9f72-dc8d-46f3-b3bf-e102911c8532.pdf  (last accessed June 4, 2026).

"rights under the [Hague] Convention [but] not the merits of any underlying child custody claims." *Id.* §§ 9001(b)(4), 9003(a). In other words, the Hague Convention allows a federal district court to consider the merits of the abduction claim (i.e., whether removal or retention was wrongful) but prohibits consideration of the underlying custody dispute. *Friedrich v. Friedrich*, 983 F.2d 1396, 1399 (6th Cir. 1993) ("*Friedrich I*"), *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

The Hague Convention's language encompasses both the wrongful removal and the wrongful retention of a child. *Argueta v. Argueta-Ugalde*, No. CV 22-12840, 2023 WL 1466820, at *4 (E.D. Mich. Feb. 2, 2023), *aff'd sub nom. Rodrigues Dos Santos Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901 (6th Cir. July 20, 2023). "Generally speaking, 'wrongful removal' refers to the taking of a child from the person who was actually exercising custody of the child. 'Wrongful retention' refers to the act of keeping the child without the consent of the person who was actually exercising custody." Hague Int'l Child Abduction Convention, Text and Legal Analysis ("Public Notice"), 51 Fed. Reg. 10494-01, 1986 WL 133056, at 10503 (Mar. 26, 1986); *see also March v. Levine*, 136 F. Supp. 2d 831, 835 (M.D. Tenn. 2000), *aff'd*, 249 F.3d 462 (6th Cir. 2001).

Pursuant to the Hague Convention, the removal or retention of a child is considered wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

10

Hague Convention, art. 3. To establish a *prima facie* case for the return of a child, the petitioner must demonstrate by a preponderance of the evidence that: (1) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (2) the removal or retention breached the petitioner's custody rights under the law of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of the child's wrongful removal or retention. *Pliego v. Hayes*, 86 F. Supp. 3d 678, 693–94 (W.D. Ky. 2015) (citing 22 U.S.C. § 9003); *McKie v. Jude*, 2011 WL 53058, at *5 (E.D. Ky. Jan. 7, 2011) (citations omitted).

If the court determines that the petitioner has proven a *prima facie* case that the child was wrongfully removed or retained within the meaning of the Hague Convention, the ICARA mandates that the child "be promptly returned unless one of the narrow exceptions set forth in the [Hague] Convention applies." 22 U.S.C. § 9001(a)(4). To that end, if the petitioner establishes a *prima facie* case of wrongful removal or retention, the burden shifts to the respondent to show that an exception applies either by clear and convincing evidence or by a preponderance of the evidence, depending on the exception at issue. *See* Hague Convention, art. 13; *Friedrich I*, 983 F.2d at 1400 (citing 42 U.S.C. §§ 11603(e)(2)(A)–(2)(B)); *Abbott v. Abbott*, 560 U.S. 1, 22 (2010) ("Return is not required if the abducting parent can establish that a [Hague] Convention exception applies."). The child should not be returned if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)). There is also an exception where the child has attached and age and degree of maturity at which it is appropriate to account of his views. 22 U.S.C.S. 9003(e)(2)(B). The child should not be returned if returning "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Friedrich*

*II,* 78 F.3d at 1067; Hague Convention, art. 20. A court may refuse to order the child's return if the parent seeking return consented or acquiesced to the removal or retention of the child. *Friedrich II*, 78 F.3d at 1067. The respondent must prove this defense by a preponderance of the evidence. *Id.*

The existence of an exception notwithstanding, "a federal court retains, and should use when appropriate, the discretion to return a child . . . if return would further the aims of the Convention." *Friedrich II*, 78 F.3d at 1067 (citation omitted); *see also* Hague Convention, art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."); *cf. Golan v. Saada*, 596 U.S. 666, 676 (2022) ("By providing that a court 'is not bound' to order return upon making a grave-risk finding, Article 13(b) lifts the Convention's return requirement, leaving a court with the discretion to grant or deny return."). This discretion is equitable in nature but "limited to exceptional cases." *Swett v. Bowe*, 733 F. Supp. 3d 225, 293 (S.D.N.Y. 2024), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024) (citing cases); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 18–19 (2014) ("[C]ourts have equitable discretion under the Hague Convention to order a child's return even after the child has become settled." (Alito, J., concurring)).

The Court considers Petitioner's *prima facie* case and the Respondent's defenses to return below.

### III. DISCUSSION OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### a. Habitual Residence

First, Petitioner must prove that that E.W. had a "habitual residence" in a foreign country that is a signatory to the Convention. A child can have only one habitual residence. *Friedrich I,* 983 F.2d at 1401. "On its face, habitual residence pertains to customary residence prior to the

removal. The court must look back in time, not forward." *Friedrich I,* 983 F.2d at 1401. Habitual residence does not depend on an actual agreement between a child's parents. *Monasky*, 589 U.S. at 77. An "actual-agreement requirement would enable a parent, by withholding agreement, unilaterally to block any finding of habitual residence . . . [and] when parents' relations are acrimonious, as is often the case in controversies arising under the Convention, agreement can hardly be expected." *Id*. at 81.

A child's "mere physical presence" in a country "is not a dispositive indicator of" his habitual residence. *Monasky*, 589 U.S. at 81. A child's residence in a country may be deemed "habitual" when it is "more than transitory." *Id*. at 76. Basically, the question is "whether a child has made a country [his] home before the date of [his] removal or retention." *Karkkainen v. Kovalchuk,* 445 F.3d 280, 292 (3d Cir. 2006); *see also Jenkins,* 569 F.3d at 553 (stating that the period immediately preceding wrongful retention determines habitual residence). Coercion of the child or parent to remain in a location can preclude the finding of habitual residence. *Monasky*, 589 U.S. at 78 ("But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.").

Further, "[f]or older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant," in determining habitual residence. *Id*. The following facts may be considered: a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings. *Id*. at 78, n.3 (citing Federal Judicial Center, J.

Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)); *see also Jenkins,* 569 F.3d at 556; *Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 526 (6th Cir. 2019). But "[n]o single fact . . . is dispositive across all cases." *Monasky*, 589 U.S. at 78. At the end of the day, "locating a child's home is a fact-driven inquiry, courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Monasky*, 589 U.S. at 78.

"The first step in determining a child's habitual residence is to discern when the alleged wrongful removal or retention took place, for 'the text of the Convention directs courts to only one point in time in determining habitual residence,'" which is "the point in time 'immediately before the removal or retention.'" *Barzilay*, 600 F.3d at 918 (quoting *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003)). Here, there seems to be no disagreement that the date of wrongful retention was August 17, 2025, when E.W. did not take the return flight to Germany and remained in Kentucky.

Thus, the Court must determine which country is E.W.'s habitual residence, Germany or the United States. This case presents a unique situation because E.W. is part of a military family and has moved frequently throughout his life due to the military orders of both his parents. Courts recognize that military families do not present the typical fact pattern, and such cases often require a more nuanced and fact-intensive analysis to determine a military child's habitual residence.

For example, in *Holder v. Holder*, 392 F.3d 1009 (9th Cir. 2004), the Ninth Circuit found that a military family's habitual residence was California even through the family had moved to

14

Germany to live on an American Air Force Base to which the father had been ordered.[5]  The family

in *Holder* only lived in Germany eight months before the mother returned to California with the

two children and did not return to Germany. *Holder*, 393 F.3d at 1012. The *Holder* court found

neither of the young children, one an infant and the other a kindergartener, developed deep rooted

ties to the family's location in Germany and thus were not acclimatized there. *Id*. at 1021. The

*Holder* court "emphasize[d] that courts must consider the unique circumstances of each case when

inquiring into a child's residence" and that "no per se rule dictates that children of U.S. military

personnel remain habitually resident in the United States when joining their parents at overseas

posts." 392 F.3d at 1016. The *Holder* court noted that "fact patterns vary considerably within the

limited universe of Convention cases involving military personnel," and "that military families do

not generate a typical fact pattern and, in all Convention cases, emphasis is on the details of the

case at hand." *Id*.

In *Farr v. Kendrick*, the court found that children who lived in Mexico for several years

did not have a habitual residence in Mexico when the children had U.S. citizenship and expired

Mexican visas, did not speak Spanish or attend school in Mexico, and most family lived in the

United States. 824 Fed. App'x 480, 482 (9th Cir. 2020) (unpublished) (finding children were

habitual residents of the United States).

In *Roberts v. Roberts*, the court concluded that England was not the child's habitual

residence, because the parents were there "for a specific and delimited period"—namely, the

---

[5] The *Holder* court examined the parents' "settled intention" standard in determining habitual residence. *Holder*, 393 F.3d at 1012.  Since *Holder*, the United States Supreme Court has held that no agreement by the parties is required; habitual residence does not depend on an actual agreement between a child's parents to establish habitual residence and adopted a less strict test looking at the totality-of-the-circumstances. *Monasky*, 589 U.S. at 77.  Nonetheless, in addition to the intentions of the parents, *Holder* also analyzed the circumstances of whether the children we acclimatized in determining habitual residence, which remains good law and is useful to the Court's considerations here.

father's military tour. No. 24-CV-817, 2024 WL 5191971, at *5 (E.D. Va. Dec. 20, 2024). The Court noted that "military families do not present the typical fact pattern and concluded that conditional stays may not demonstrate a shared intention to shift a child's habitual residence away from the country where they previously resided." *Id*. at *4.

In *Staggers v. Timmerman*, the Court concluded that the United States, not Mexico, was the child's habitual residence.  746 F. Supp. 3d 635, 642 (S.D. Iowa 2024). The Court emphasized that the child and her family were fluent in English, not Spanish, the child's extended family was in the United States, and the child had only lived in Mexico for approximately nine months in contrast to approximately five years in the United States. Additionally, the court found notable the fact that the parties had moved seven times during the child's six years of life, maintained their businesses and the family's finances in the United States, with neither party working in Mexico, and frequently traveled to the United States for work or to visit family.

*1.  E.W.'s Connections to Germany and the United States*

The record in this case has two sides when it comes to E.W.'s habitual residence. *Monasky*, 907 F.3d 404, 409 (6th Cir. 2018), *aff'd*, 589 U.S. 68 (2020) ("Faced with this two-sided record, Judge Oliver had the authority to rule in either direction. He could have found that Italy was A.M.T.'s habitual residence or he could have found that the United States was her habitual residence."). E.W. has spent appreciable amounts of time in his fourteen-year life in both the United States and Europe; specifically, Georgia (United States), Portugal, North Carolina, and Germany. As noted above, E.W. and his older sister moved to Stuttgart, Germany in January 2021 when Petitioner began employment there under a five-year contract term.  E.W. lived in Stuttgart from 2021 through early June 2025. Respondent signed documentation that facilitated E.W. and

16

his older sister being taken care of and settled in Germany with Petitioner. [DE 27 at 376]. Before Germany, E.W. resided in Belgium and the United States in North Carolina.

E.W.'s immigration status is a relevant factor. *Monasky*, 589 U.S. at 78, n.3. He is a United States citizen and was born in the United States. Respondent and Petitioner are also United States citizens. The Court has not been presented with evidence that Petitioner, Respondent, or E.W. hold dual citizenship of any type.

During his four years in Germany, E.W. attended school on a United States military installation [DE 27 at 321-22, 352] and participated in various activities and sports such as kickboxing, soccer, football, and basketball. [DE 27 at 324]. Several of the activities occurred on the military installation or base, and some occurred off the military installation or base. Often, E.W. would ride the bus from the installation where his school was located to the military base where Petitioner works after school to play with his friends, go to the youth center, or play basketball. [DE 27 at 354]. Petitioner testified that E.W.'s basketball and football leagues are year-long and the sports he played were made up of local German teams. [DE 27 at 324, 353]. Petitioner had to get permission from Baden-Wurttemberg, the state within Germany where they reside, for E.W. to play as an American on a German team. [DE 27 at 353]. E.W. was also involved in the Kappa League male mentorship program, the Robotics Club, and was selected for the yearbook club at his high school. [DE 27 at 325]. These events took place on the United States military installation or base. [DE 27 at 355].

E.W. had a doctor, dentist, orthodontist, and orthopedist in Germany. [DE 27 at 334-35]. It is not clear whether these doctors were seen on the installation or within the German community; however, E.W. is covered under Respondent's health insurance, Tricare, which is the uniformed

services healthcare program for active duty and retired service members and their spouses and children. *See* https://tricare.mil/ (last accessed July 1, 2026).

E.W.'s primary language is English; Petitioner asserts that E.W. speaks German and attended cultural immersion classes while in Germany. [DE 1 at ¶¶ 31, 35]. Respondent disputes that E.W. speaks German and submitted an affidavit from E.W. which states he does not speak, write, or read German and as noted below E.W. told the guardian *ad litem* he does not speak fluent German. [DE 23-2 at 226, DE 39 at 488]. E.W.'s belongings are in Germany. [DE 1 at ¶ 32].

During the summers of 2022, 2023, and 2024, E.W. and his sister visited Respondent in the United States. [DE 27 at 324]. In the summer of 2022, the children visited for two weeks. [DE 1 at 20]. In the summer of 2023, the children visited from June 27 through August 7. DE 27 at 324]. The children spent the entire summer of 2024 with Respondent. [DE 27 at 393]. After each summer visit to the United States, the children returned to Germany to live with Petitioner. [DE 27 at 324].

Despite residing in Germany, E.W. consistently expressed to Petitioner and Respondent that he would like to live in the United States and play football in the United States. [DE 27 at 346-48, 353]. He expressed to the guardian *ad litem* that he does not speak fluent German and does not like living in Germany, does not like interacting with people off base, and does not want to live in a country where he does not speak the language. [DE 39 at 488]. E.W.'s older sister also expressed a desire to live in the United States but resided in Germany through high school and until the summer of 2025, when she moved to the United States at the beginning of college. Respondent intended in 2021 that he would eventually join Petitioner and the children in Germany, but further deterioration in the relationship occurred around 2022 and it became apparent at that time to Respondent, that these plans would not come to fruition. During that timeframe Respondent's

active military assignments kept his living arrangements in a state of flux as he was frequently required to travel. But that changed when Respondent retired in 2024, and he settled in Kentucky. While the parents had a shared intent that the children live with Petitioner in Germany, that began to change in at least 2024 and the summer of 2025 when E.W. made it clear he did not want to return to Germany and Respondent determined he was in a stable position for E.W. to live in the United States with him. Petitioner's assignment in Germany was also extended. [DE 34 at 431]. E.W. testified that he informed Petitioner that he did not want her to extend her term in Germany on multiple occasions. [DE 34 at 7].

Respondent emphasizes that E.W. did not want to live in Germany. It is not in dispute that E.W. wished to live in the United States and preferred to live in the United States, and it is also not in dispute that Germany was primarily where his life took place in the several years before his retention. For four years, his schooling and many activities, however, took place on a satellite military installation of the United States, rather than within the German community. While E.W. preferred the United States and objected to living in Germany, he lived in Germany with his mother, who was his primary caregiver, where his belongings were located, where he saw his regular doctors, attended school, and participated in activities and sports.

That E.W.'s life primarily took place on a satellite installation of the United States within Germany does not foreclose Germany being his habitual residence, but life primarily on a satellite installation of the United States within Germany is a unique circumstance that lends itself to less of a meaningful connection to Germany. The nature of military relocations presents unique factual circumstances. This is demonstrated by E.W.'s lack of fluency in the German language, the transient nature of his friends on base, and his general lack of assimilation into German culture.

19

In addition, this case also differentiates itself as both parents were originally subject to foreign and domestic military deployments (Petitioner as civilian military employee and Respondent as active-duty military). From the record, there is also some evidence that Petitioner's continuing assignment in Germany is by her choice.

### 2. E.W.'s Habitual Residence

Some facts counsel against finding the United States as E.W.'s habitual residence and some facts counsel against finding Germany as E.W.'s habitual residence.  In terms of quantity of facts, the Court could find Germany as E.W.'s habitual residence as that is where he primarily resided the four years (an appreciable time) before his retention in the United States, attended school, had doctors, made friends, and participated in activities. The Court, however, does not put much weight on E.W.'s socialization with friends in Germany, as those relationships appeared to be more transitory, linked to military deployments and not acclimatization to Germany.  Importantly, E.W. has his mother in Germany, and she has chosen to extend her military tour as a civilian to remain in Germany. From these facts, the Court could find Germany as E.W.'s habitual residence.

While E.W.'s time in Germany was something more than transitory, there are other facts, less in quantity, but that may carry more weight, pointing to the United States as E.W.'s habitual residence. E.W.'s father, sister, and extended family all reside in the United States. E.W.'s sister, who he lived with in Germany with his mother, now lives in Kentucky attending college. E.W. does not speak German and his life in Germany primarily takes place on a United States military installation within Germany.  E.W. expressed to the Court that Germany is not a place he wants to be settled and that some of his close friends made on the installation have moved away. [DE 34 at 432]. E.W. was born in the United States, is a United States citizen, and moved to Columbus, Georgia as a baby where he resided for some period of time. [DE 23 at 211, DE 39 at 489]. E.W.

then resided in Belgium for approximately 3 to 4 years and attended school there from pre-kindergarten to second grade. [DE 27 at 352]. The family then moved from Belgium to Fort Bragg, North Carolina.  [DE 23 at 211, DE 27 at 322]. E.W. resided in the United States in Fort Bragg, North Carolina for approximately 2.5 to 3 years as he attended third grade, fourth grade, and part of fifth grade there. [DE 23 at 211, DE 27 at 322].  Most of his life has been spent outside of Germany, with appreciable time in the United States before moving to Germany.

Additionally, E.W.'s parents no longer jointly share an intent that E.W. remain in Germany for the duration of Petitioner's contract, which she has unilaterally extended. The joint intent of the parties appears to have been based on Respondent's military service deployments and Petitioner's civilian military assignment. The circumstances that brought about that agreement have obviously changed due to Respondent's retirement from the military and settlement in Kentucky. Given E.W.'s older age and the change in the parties' circumstances, the Court does not put significant weight on Petitioner's and Respondent's original intent as to where E.W. lives, and it is just one factor of many the Court considers.

As noted above, military families do not present the typical fact pattern and present unique situations in determining habitual residence. *Holder*, 393 F.3d at 1016 ("fact patterns vary considerably within the limited universe of Convention cases involving military personnel . . . military families do not generate a typical fact pattern . . ."); *Roberts*, 2024 WL 5191971, at *4 (noting military families do not present the typical fact pattern and concluding that conditional stays may not demonstrate a shared intention to shift a child's habitual residence away from the country where they previously resided.). Here, habitual residence is a close and difficult call since E.W. resided in Germany for four years based on agreement of his parents and he attended school there on a United States military installation and participated in numerous sports and activities,

21

some of which occurred in the community but most of which occurred on the installation. However, E.W. is an American citizen, he spent an appreciable amount of his younger years in the United States, his primary language is English, and he does not speak fluent German, and most of his engagement took place on an installation of the U.S. military. Most of E.W.'s family resides in the United States, including his older sibling who is now attending college close to where he lives with his father. The majority of E.W.'s life has not been spent in Germany. Based on the evidence and circumstances presented, Petitioner has not established by a preponderance of the evidence that Germany was E.W.'s habitual residence at the time he was retained in Kentucky. Looking back in time before E.W. was removed, E.W.'s habitual residence was the United States.

Under the totality of the circumstances, E.W.'s habitual residence at the time of removal was the United States. Accordingly, this finding is sufficient and dispositive to determine E.W. cannot be returned to Germany under the Hague Convention. While the Court does not wade into the numerous allegations back and forth between the parties, as those are custody issues, the United

States remains his habitual residence and a court in the United States needs to decide the custody issue.[6]

### b.      Exceptions

Because Petitioner has not established a *prima facie* case of wrongful removal or retention, the Court need not address whether any exceptions would apply. However, for purposes of completeness, the Court will consider whether an exception would preclude E.W.'s return to Germany even if he had been wrongfully retained in the United States.

### 1.   Grave Risk Exception

The Court appointed a guardian *ad litem* pursuant to Federal Rule of Civil Procedure 17(c)(2) to assist the Court in making a fully formed decision and to render a recommendation as to whether there is grave risk of physical or psychological harm to the child. [DE 38].

---

[6] Having found that the United States was E.W.'s habitual residence, the Court need not delve into prongs 2 and 3 of Petitioner's *prima facie* case. Nevertheless, the Court provides a brief analysis here. There is no dispute that Germany is a signatory to the Hague Convention. Thus, if the Court had found Germany to be E.W.'s habitual residence at the time of his retention, Petitioner would be required to prove by a preponderance of the evidence that she was exercising custody rights over E.W. at the time of E.W.'s removal and E.W.'s removal breached those rights.

Custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." Hague Convention, art. 3. "Under German law, where parents are married at the birth of the child, they have joint custody over the child until the operation of law . . . or a court order terminates joint custody." *Krefter v. Wills*, 623 F. Supp. 2d 125, 133 (D. Mass. 2009) (quoting *Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008)). German law gives both parents equal *de jure* custody of the child, German Civil Code 1626(1), and, with a few exceptions, this *de jure* custody continues until a competent court says otherwise. *See Currier v. Currier*, 845 F. Supp. 916, 920 (D.N.H. 1994) ("under German law both parents retain joint rights of custody until a decree has been entered limiting one parent's rights"); *Wanninger*, 850 F. Supp. at 78 (D. Mass. 1994). There is no dispute that Petitioner and Respondent were married in 2008, E.W. was born in 2011, and they remained married at the time E.W. was retained in the United States (and remain married now). Thus, if Germany was E.W.'s habitual residence, Petitioner held custody rights under German Law at the time E.W. was retained. As a result, the Court could find Petitioner has proven by a preponderance of the evidence she was exercising custody right under German Law at the time E.W. was retained.

Similarly, if Germany was E.W.'s habitual residence, the Court could have found Petitioner was exercising her custody rights at the time of E.W.'s wrongful removal or retention and that those rights were breached by E.W.'s retention, given that there is no evidence in the record to support that Petitioner had abandoned E.W. at the time of his retention. Respondent cites authority that given E.W.'s age of fourteen, his objection to parental custody by Petitioner could prevent Petitioner from obtaining sole custody of him under German law. [DE 23 at 221, n.11]. The Court need not resolve this argument.

23

Courts are not bound to return a child to the challenging party if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, arts. 12–13(a)–(b).  This exception requires clear and convincing evidence. 29 U.S.C. § 9003(e)(2). The guardian *ad litem* did not find a grave risk that E.W.'s return would expose him to physical or psychological harm or otherwise place the child in an intolerable situation.  [DE 39 at 503]. The Court agrees with this recommendation. Although E.W. has strong objections to returning to Germany, the record does not support a finding that his return to Germany would expose him physical or psychological harm or otherwise place the child in an intolerable situation.

### 2. *Age and Maturity Exception*

Respondent raises the age and maturity defense, arguing that even if Petitioner were to prove a *prima facie* claim for return of E.W. to Germany, that E.W. has reached an age and degree of maturity at which it is appropriate to take account of E.W.'s views. The age-and-maturity exception is one of "the narrow exceptions set forth in the [Hague] Convention" for denying a wrongful-removal petition. 22 U.S.C. § 9001(a)(4). The court can "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." Hague Convention, art. 13.

To find the age-and-maturity exception applies, court must first make a factual finding as to whether the child is mature enough for his or her wishes to be given weight. *Deravil v. Jean*, No. 25-3636, 2026 WL 1266368, at \*3 (6th Cir. Apr. 21, 2026) (citing *Simcox*, 511 F.3d at 604). The Sixth Circuit has noted "[w]e do not hesitate in saying that a fifteen-year-old will usually be sufficiently mature, and a fifteen-month-old will not." *Boa-Bonsu v. Owusu*, No. 25-3862, 2026 WL 1785202, at \*5 (6th Cir. June 22, 2026) (citing *Custodio v. Samillan*, 842 F.3d 1084, 1092

24

(8th Cir. 2016) (fifteen-year-old child "undisputedly mature")). The Sixth Circuit also emphasizes that "the inquiry . . . must focus on the facts of the individual case because there is no age cutoff below which a child may not, as a matter of law, be considered mature" and that "[a]t its core, the age and maturity exception is about 'the possibility of [a child's] interpreting [his or her] own interests.'" *Id*. at *6 (citing expert report). Moreover, resisting the urge to cry during the *in-camera* interview does not negate a finding of maturity as "[w]e are hard-pressed to imagine a scenario more likely to arouse emotion in even the most precocious child . . ." *Id*. at *7.

Then, if the child is mature enough, the court must also "make a factual finding as to whether the child has actually objected to repatriation—a mere preference against returning to the country of habitual residence will not suffice." *Deravil*, 2026 WL 1266368, at *3. In other words, the court considers "whether the child had made 'particularized objections to returning,' as opposed to 'a more generalized desire to remain.'" *Boa-Bonsu*, 2026 WL 1785202, at *7 citing *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007). "[A] meaningful 'particularized objection' is sufficient for the exception to apply . . . [while] a general preference to remain in the United States" is not. *Id*.

Also, in determining whether the age and maturity exception applies, "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." *Boa-Bonsu*, 2026 WL 1785202, at *9 (citing Hague Convention Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)).

Finally, even if the court determines the exception applies, it can still use its discretion to grant the petition and order repatriation "if return would further the aims of the Convention."

25

*Friedrich II*, 78 F.3d at 1067. Respondent has the burden of proving this exception by a preponderance of the evidence. *Id*. (citing 29 U.S.C. § 9003(e)(2)(B)).

"Whether a child is mature enough to have its views considered is a factual finding, and as such, the district court is entitled to deference." *Simcox*, 511 F.3d at 604; *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022) (citation modified) (quoting *United States v. Caston*, 851 F. App'x 557, 560 (6th Cir. 2021)) ("We must therefore "defer to the district court's finding . . . 'even if we would have made the opposite finding,' so long as [its] stor[y] [is] plausible on the record as a whole."). So too is a district court's determination that a mature child objects to his or her return. *Boa-Bonsu*, 2026 WL 1785202, at *4. Application of the age and maturity exception "should be judged on appeal by a clear-error review standard." *Monasky*, 589 U.S. at 84; *Vasconcelos v. Batista*, 512 F. App'x 403, 407 (5th Cir. 2013) ("[T]he district court's finding that [the child] objected is subject to clear error review."). "Such review makes good sense in the Hague Convention context because it 'speeds up appeals and thus serves the Convention's premium on expedition.'" *Boa-Bonsu*, 2026 WL 1785202, at *4 (citing *Monasky*, 589 U.S. at 84).

> Clear error review in this context must also incorporate the recognition that the district court stands in a unique position to assess witnesses' demeanor and credibility. *See, e.g.*, *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003); *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 543 (6th Cir. 1989). Its advantage in this respect is heightened even further when the witness is a minor child whose answers may not come across as clearly in a court reporter's transcript. *See Simcox*, 511 F.3d at 604 ("The district court was obviously in a much better position to judge the child's maturity than are we."); *De Silva*, 481 F.3d at 1287 ("We are also mindful of the magistrate judge's opportunity to observe [the child] in person, and we accord great deference to the court's findings based on that experience.").

*Boa-Bonsu*, 2026 WL 1785202, at *4-5.

1.  E.W.'s Maturity

The Court appointed a guardian *ad litem* pursuant to Federal Rule of Civil Procedure 17(c)(2) to assist the Court in making a fully formed decision and to render a recommendation as to whether the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to consider the child's wishes, as well as the extent to which the child's preference is the product of a parent's undue influence. [DE 38]. The guardian *ad litem* was not asked to make a recommendation as to E.W.'s habitual residence.

Turning to the analysis, it must be noted at the outset that the guardian *ad litem* did not conclude Respondent has met the age and maturity exception by a preponderance of the evidence. [DE 39 at 506]. The guardian *ad litem* did not find E.W.'s stated reasoning for preferring to live in the United States as mature and objective. The Court respects the guardian *ad litem's* work, report, and recommendations, and the report has greatly assisted the Court and provided useful information. However, it is also notable that the guardian *ad litem's* opinion had not considered the Sixth Circuit's opinion in *Boa-Bonsu*, 2026 WL 1785202, which clarifies the standard for finding the age and maturity exception.

The Court interviewed E.W. *in camera*, and found E.W. sufficiently mature enough for a child of his age for his wishes to be considered. E.W.'s demeanor was appropriate, he understood the Court's purpose and questions and was clear in describing his reasons for his objection. Some of the answers and behavior the guardian *ad litem* found immature "are far from unusual for a 13-year-old in their conversations with adults," and it would "be improper to require much more from a 13-year-old." *Deravil*, 2026 WL 1266368, at *4 (citing to Hague Convention, arts. 4, 13 (explaining that the exception applies to a child who is under the age of 16 and displays a "degree of maturity" that warrants considering his or her views)). The Court does not entirely disagree with

27

the guardian *ad litem* that E.W. may have been inarticulate at times and given short answers to questions, but based on the Court's own interactions with E.W. *in camera*, as well as information gleaned by the Court from the guardian *ad litem's* report and parties' filings, it is satisfied that E.W. sufficiently mature for a 14-year-old for his wishes to be considered. *Boa-Bonsu*, 2026 WL 1785202, at **4-5 (noting deference to the district court's "unique position to assess witnesses' demeanor and credibility"). Further, E.W.'s reasons for objecting to returning to Germany are supported by and consistent with the facts found by the guardian *ad litem*.

Additionally, the Court does not find that E.W.'s tearfulness at moments with the Court *in camera* and the guardian *ad litem* to negate his overall maturity given the importance of the issue at hand and obvious emotion it evokes. *Boa-Bonsu*, 2026 WL 1785202, at *7 (Fighting the urge to cry "during the in-camera interview does not move the needle . . . [w]e are hard-pressed to imagine a scenario more likely to arouse emotion in even the most precocious child . . .").

## 2. Objection vs. Preference

Having found E.W. sufficiently mature for the Court to consider his wishes, the Court determines whether E.W. "has actually objected to repatriation—a mere preference against returning to the country of habitual residence will not suffice." *Deravil*, 2026 WL 1266368, at *3. "There are no magic words that indicate an objection rather than a preference; district courts should look to the substance of a child's statements." *Id*. (citing *Rodriguez v. Yanez*, 817 F.3d 466, 477 (5th Cir. 2016)). Simply being happier in one country but being willing to acquiesce to life in another country is not enough. *Id*. "[T]he child must provide particularized reasons as to why returning to his or her country of habitual residence is unacceptable." *Id*., at *6 (6th Cir. Apr. 21, 2026).

28

Based on the record, including the Court's own interactions with E.W. *in camera*, his answers, and body language, the Court finds E.W. has expressed particularized objections for returning to Germany, not just a more generalized desire to remain in the United States. The Court notes that E.W.'s views have been expressed to both parents over a significant period by E.W., both in 2024 and 2025, indicating that this is not merely a short-term whim but a more solidified belief. [DE 27 at 349; 355-56; 384 ("Eli had talked to me about it multiple times throughout last year [2024] and times before that."); DE 39 at 487-89].

E.W.'s particular objection involves a lack of sense of belonging in Germany, where he does not speak the language and is not especially assimilated, as well as his objection to leaving his family members, Respondent, and his sister. For a child of E.W.'s age he has given particularized reasons for return to Germany against his will being unacceptable. Those objections are particularized and not a mere wish or preference, and "the reasons [E.W.] objects to being returned are immaterial." *Boa-Bonsu*, 2026 WL 1785202, at **7-8 (citing *Dubikovskyy v. Goun*, 54 F.4th 1042, 1048 (8th Cir. 2022)). Yet, the Court finds the reasons are well taken and support the Court's finding that the United States is E.W.'s habitual residence.

Finally, the Court does not find evidence that E.W.'s objection to returning to Germany is the result of undue influence by Respondent. E.W.'s objection to living in Germany has been consistently conveyed to the parties both before and after E.W. was retained in the United States in August 2025, and those particularized objections were also consistently communicated to the Court, and the guardian *ad litem*. *Boa-Bonsu*, 2026 WL 1785202, at *9 ("[U]ndue influence is not a standalone factor in the Hague Convention analysis. It is instead best understood as a component of the district court's determination that a child is sufficiently mature and objects to his return."). Nor would the Court find that "return would further the aims of the Convention," such that the age

and maturity exception should be disregarded. *Friedrich II*, 78 F.3d at 1067. The age and maturity exception applies and would serve as a basis for the Court to deny Petitioner's petition even if Germany were found to be E.W.'s habitual residence.

## CONCLUSION

E.W. is not subject to return to Germany under the Hague Convention and ICARA. As noted above, this order does not resolve the ultimate issue of custody. A competent court of the Commonwealth of Kentucky will be making the judgment about custody. For the reasons stated above, Petitioner Shanita White's Petition, for return of her minor child from the Commonwealth of Kentucky pursuant to the Hague Convention on the Civil Aspects of International Child Abduction [DE 1] is **DENIED** and this matter is **DISMISSED**.  The Court will enter separate judgment.

Rebecca Grady Jennings, District Judge
United States District Court

July 8, 2026

30